**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SUSAN STOWELL,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **NO. 06-2103** |
| | : | |
| **TOLL BROTHERS., INC.,** | : | |
| **Defendant.** | : | |

## ORDER

Defendant Toll Brothers, Inc. asks me to enforce the settlement the Parties purportedly

reached on August 13, 2007.  Having reviewed this matter *de novo*, I will accept Magistrate

Judge Rice's recommendation and grant Defendant's Motion to Enforce Settlement.

## BACKGROUND

On May 18, 2006, Susan Stowell sued Toll Brothers, Inc. (her former employer), alleging

sexual discrimination, sexual harassment, hostile work environment, and retaliation in violation

of Title VII, the Family Medical Leave Act, the Pennsylvania Human Relations Act, and the

Pennsylvania Constitution.  (Doc. No. 1.)  This case was originally assigned to the late,

Honorable Clifford Scott Green, and Plaintiff was originally represented by Sidney Gold,

Esquire.  On September 20, 2006, Judge Green granted Mr. Gold's Motion to Withdraw and

gave Plaintiff thirty days to obtain new counsel.  (Doc. No. 11.)  Judge Green then granted

Plaintiff's request for an extension of time to retain counsel.  (Doc. No. 12.)  On December 18,

2006, Andrew S. Abramson, Esquire began representing Plaintiff.  (Doc. No. 13.)  On June 8,

2007, this case was reassigned to me.  (Doc. No. 23.)

On August 13, 2007, the Parties participated in a settlement conference before Judge Rice.  Following the conference, Judge Rice informed me that the Parties had reached a settlement, and I dismissed the matter pursuant to Local Rule 41.1(b).  (Doc. No. 39.)

After August 13th, Mr. Abramson and Defendant's counsel, Jill Lashay, Esquire together prepared a final written Settlement Agreement.  On September 7, 2007, Mr. Abramson informed Ms. Lashay that Plaintiff refused to sign that Agreement.  On September 20, 2007, I vacated my Rule 41.1(b) Order (Doc. No. 40), and on October 1, 2007, Defendant filed a Motion to Enforce Settlement.  (Doc. No. 43.)  I referred the matter to Judge Rice for a Report and Recommendation.

On October 15, 2007, Judge Rice conducted an evidentiary hearing on Defendant's Motion, at which Mr. Abramson, Ms. Lashay, and Plaintiff testified.  Judge Rice had previously informed the Parties that if Ms. Lashay and Mr. Abramson testified at the hearing, their clients would need different counsel to represent them during the hearing.  Defendant obtained different counsel for the hearing; Plaintiff did not.  Accordingly, Judge Rice offered to continue the matter to allow Plaintiff to obtain counsel to represent her at the hearing if she wished to do so.  (Tr. Oct. 15, 2007 at 2-14.)  After considering the matter for more than an hour, Plaintiff chose to proceed *pro se.*  (Tr. Oct. 15, 2007 at 15-16.)

Mr. Abramson testified during the October 15th hearing that Plaintiff understood and agreed to all the settlement terms on August 13, 2007.  Both Mr. Abramson and Ms. Lashay testified that Judge Rice read each term of the settlement aloud to the Parties at the conclusion of the August 13th conference, and that Plaintiff verbally agreed to each.  (Doc. No. 59 at 4.)

2

Plaintiff testified that she had "very little recollection" of the August 13th conference, and that she had not intended to settle her case and did not understand that she had done so.  (Tr. Oct. 15, 2007 at 97.)  Plaintiff testified that she thought she was merely being dismissed from the meeting when Judge Rice summarized the settlement terms at the end of the conference.  (Doc. No. 59 at 4; Tr. Oct. 15, 2007 at 97.)

On October 28, 2007, Judge Rice issued a Report recommending that I grant Defendant's Motion and enforce the settlement.  (Doc. No. 59.)  Judge Rice credited the testimony of Mr. Abramson and Ms. Lashay and discredited Plaintiff, including her testimony that she did not recall verbally agreeing to each term of the settlement.  (Doc. No. 59 at 4.)  Accordingly, Judge Rice found that Plaintiff understood and assented to each term of the settlement, and concluded that a binding, enforceable agreement had been reached.

On November 15, 2007, I held a status hearing in this matter and granted the Parties thirty days to file Objections to the Report and Recommendation.  (Tr. Nov. 15, 2007 at 2; Doc. No. 62.)  I had earlier denied Mr. Abramson's request to withdraw as Plaintiff's counsel.  (Doc. Nos. 51, 54.)  In light of Judge Rice's Report, however -- in which he recounted that Mr. Abramson and Plaintiff had offered contradictory testimony -- I reconsidered and allowed Mr. Abramson to withdraw.  (Tr. Nov. 15, 2007 at 1; Doc. No. 63.)  I told Plaintiff that if she did not obtain new counsel within thirty days, she would again proceed *pro se*. (Tr. Nov. 15, 2007 at 2.)

On November 20, 2007, Plaintiff moved without explanation for a thirty day extension to file her Objections.  (Doc. No. 66.)  On November 26, 2007, I received a letter from Plaintiff regarding my Orders allowing Mr. Abramson to withdraw and directing the Parties to file objections within thirty days.  (Doc. No. 67.)  Plaintiff informed me that she was "having trouble

3

hearing [and] . . . concentrat[ing]," and thus did not "know the reasons stated during [the] November 15, 2007 hearing for the order(s)."

On December 17, 2007, Plaintiff filed *pro se* Motions in which she asked me to appoint an attorney to represent her. (Doc. Nos. 72, 73.)  Accordingly, on December 19, 2007, I ordered that this Court's Panel for Appointment of Counsel in Title VII Cases obtain counsel to assist Plaintiff in filing Objections to Judge Rice's Report and Recommendation. (Doc. No. 78.)  From January through June of 2008, the Panel referred Plaintiff's case to three different attorneys, each of whom, after investigating the matter, declined the referral.  Finally, on June 6, 2008, I directed the Parties to file their Objections no later than June 20, 2008, and scheduled a hearing on those Objections for June 27, 2008. (Doc. No. 92.)  In the event Plaintiff did not retain counsel, I directed her to proceed *pro se* in preparing and filing any Objections to Judge Rice's Report. (Doc. No. 92.)

On June 12, 2008, Plaintiff filed *pro se* Motions in which she asked me, *inter alia*, to place this case in suspense and appoint counsel for her. (Doc. Nos. 93, 94, 95.)  I denied Plaintiff's Motions on June 13, 2008. (Doc. No. 96.)  On June 19, 2008, Shelly Farber, Esquire filed a Motion for an Extension of Time to File Objections on behalf of Plaintiff. (Doc. No. 97.)  Mr. Farber requested additional time to make an informed decision as to whether he would represent Plaintiff. (Doc. No. 97 at 2.)  On June 26, 2008, I granted Mr. Farber's request and ordered the Parties to file Objections to Judge Rice's Report by July 25, 2008. (Doc. No. 101.)

On July 25, 2008, I received a letter from Mr. Farber informing me that he could not "effectively represent [Plaintiff] in the manner she desires." (Doc. No. 102.)  That same day, Plaintiff again filed *pro se* Motions asking me, *inter alia*, to place this case in suspense and

appoint counsel for her.  (Doc. Nos. 103, 104, 105.)  On July 28, 2008, I denied Plaintiff's

Motions and ordered the Parties to submit their Objections by August 28, 2008.  (Doc. Nos. 107,

109.)

On August 21, 2008, Plaintiff filed a Motion requesting an extension of time to file her

Objections.  (Doc. No. 111.)  On August 27, 2008, I granted Plaintiff an additional week.  (Doc.

No. 113.)  Following my August 27th Order, Plaintiff obtained new counsel, Mark J. Vasoli,

Esquire, who filed Objections to Judge Rice's Report on September 4, 2008.  (Doc. No. 115.)

In light of Plaintiff's Objections, I conducted an evidentiary hearing on October 17, 2008.

Plaintiff (who was represented by Mr. Vasoli) testified, as did Mr. Abramson and Ms. Lashay.

Mr. Abramson produced contemporaneous notes of his discussions with Plaintiff.  As discussed

at the hearing, the Parties subsequently authenticated and submitted email correspondence

between Plaintiff and Mr. Abramson before and after the August 13th settlement conference.  As

I explain below, I credit the testimony of Mr. Abramson and Ms. Lashay, discredit Plaintiff's

testimony, and find that Plaintiff knowingly and freely agreed to settle her case during the August

13th settlement conference.  Plaintiff resists the August 13th settlement because she seeks more

favorable terms from Defendant.


**FINDINGS OF FACT**

The Rule 16 Conference

On July 3, 2007, I held a scheduling conference in this matter.  Contrary to my Order,

Plaintiff was not present.  In accordance with my Order, in-house counsel for Defendant was

present.  Counsel for both sides stated that they wished to engage in settlement discussions, and

Mr. Abramson stated that he had previously made a demand of $500,000 after receiving

authorization to do so from Plaintiff.  (Tr. Oct. 17, 2008 at 8, 48, 51.)  Negotiations began, with

Mr. Abramson consulting with his client by telephone.  I suggested that Mr. Abramson ask

Plaintiff -- who resides in Newton Square -- to come to the Courthouse so that she could

participate in the negotiations directly.  (Tr. Oct. 17, 2008 at 8, 49.)  Plaintiff arrived sometime

later and the negotiations continued.  (Tr. Oc. 17, 2008 at 8-9, 50.)

Plaintiff actively participated in the ensuing settlement discussions, eventually reducing

her demand to $275,000.  (Tr. Oct. 17, 2008 at 10-11, 54-55.)  Defendant eventually raised its

offer to $200,000, which Plaintiff rejected.  (Tr. Oct. 17, 2008 at 11-12, 57.)  Although the

Parties were unable to reach an agreement on the settlement amount, they agreed to all the non-

monetary terms discussed, including confidentiality, a mutual non-disparagement clause, that

Defendant would provide a neutral employment reference for Plaintiff, and that all disputes

respecting the settlement would be finally decided by me.  (Tr. Oct. 17, 2008 at 14, 56-57.)

Throughout the negotiations, Mr. Abramson kept his client fully apprised and acted only

with her approval.  (Tr. Oct. 17, 2008 at 48-57.)  I ultimately adjourned the settlement conference

so that Defendant's in-house counsel could obtain additional settlement authority.  (Tr. Oct. 17,

2008 at 11-12, 56.)  The Parties agreed to a Memorandum of Understanding outlining the non-

monetary terms they had reached during the conference.  That portion of the Memorandum of

Understanding indicating the actual dollar amount of the settlement was left blank pending the

Parties' agreement on that term.  (Tr. Oct. 17, 2008 at 13-14, 55; Ex. D-1.).  I did not ask the

Parties to sign the Memorandum of Understanding.

Following the July 3rd conference, in-house counsel obtained additional settlement

authority, and increased Defendant's offer to $250,000.  (Tr. Oct. 17, 2008 at 14-15, 60.)  Mr.

Abramson communicated this offer to Plaintiff, who rejected it.  (Tr. Oct. 17, 2008 at 15, 61-63.)

The Parties jointly reported on July 12, 2007 that they could not reach an agreement on the dollar

amount.  I then issued a Case Management Order, which provided the Parties with a schedule for

renewed discovery, dispositive motions, and trial.  (Doc. No. 32.)  Over the ensuing weeks, the

Parties resumed taking discovery and otherwise litigating this matter.


The August 13, 2007 Settlement Conference

Pursuant to my Case Management Order, the Parties were to attend a settlement

conference before Judge Rice on August 13, 2007.  (Doc. No. 33.)  On July 20, 2007, Mr.

Abramson sent an email to Plaintiff reporting that a settlement conference would be held before

Judge Rice.  (ASA0005.)  In an email to Mr. Abramson dated August 7, 2007, Plaintiff asked

whether there was "any way that we can object to any further mediation and go directly to

tr[ia]l."  (ASA0012.)  Mr. Abramson responded by email that same day, stating that "another

settlement conference is a plus not a minus."  (ASA0012.)  Plaintiff and Mr. Abramson then

agreed to meet on August 10, 2007 to discuss the case and prepare for the conference.

(ASA0012.)

During the August 10th meeting, which lasted more than two hours, Plaintiff expressed

frustration that Defendant had not acceded to her $275,000 demand on July 3rd.  (Tr. Oct. 17,

2008 at 94.)  Mr. Abramson discussed with Plaintiff the pros and cons of proceeding to trial.  He

also reviewed the strengths and weaknesses of Plaintiff's case, and recommended that should

Defendant again offer $250,000 and agree to structure the payment favorably for tax purposes,

7

Plaintiff should strongly consider accepting the offer.  (Tr. Oct. 17, 2008 at 95-97.)

During the hearing before me, Mr. Abramson described the weaknesses in Plaintiff's case that he had discussed with Plaintiff and had figured in his August 10th recommendation that she accept a $250,000 offer.  I ordered that portion of the record to be sealed.  (Tr. Oct. 17, 2008 at 101.)  I ordered Ms. Lashay (who continues to represent Defendant) and Defendant's in-house counsel out of the courtroom during this portion of Mr. Abramson's testimony, and directed the lawyer who represented Defendant during the October 17th hearing not to discuss that testimony with Ms. Lashay or Defendant.  (Tr. Oct. 17, 2008 at 101; Tr. Oct. 17, 2008 at 14 (under seal)).

On August 13, 2007, Judge Rice conducted a settlement conference in his chambers. Plaintiff, Mr. Abramson, Ms. Lashay, and Defendant's in-house counsel were present.  Once again, Mr. Abramson kept his client fully informed and acted with her approval throughout.  (Tr. Oct. 17, 2008 at 69-78.)  When Defendant increased its offer to $265,000, Judge Rice informed Plaintiff and Mr. Abramson.  (Tr. Oct. 17, 2008 at 19-20, 68-69.)  Mr. Abramson then discussed the offer privately with Plaintiff, and again reviewed the non-monetary terms of the settlement with her.  (Tr. Oct. 17, 2008 at 19-20, 117.)  Mr. Abramson then negotiated with Ms. Lashay respecting how the payment would be structured for tax purposes.  Defendant agreed that $33,000 would be treated as taxable income, with the balance to be reported on a Form 1099. (Tr. Oct. 17, 2008 at 70.)  Mr. Abramson believed that this was a "fabulous settlement agreement" and that it "would [have been] impossible for [him] to resolve [the tax issues] any better for [Plaintiff]."  (Tr. Oct. 17, 2008 at 70, 81.)  Accordingly, Mr. Abramson recommended that Plaintiff accept the settlement.  (Tr. Oct. 17, 2008 at 69-70.)  Plaintiff then made a lengthy telephone call to a third person to discuss the offer.  (Tr. Oct. 17, 2008 at 19-20.)  Following this

8

call, Plaintiff informed Mr. Abramson that she agreed to the settlement.  (Tr. Oct. 17, 2008 at 75,

117.)  Mr. Abramson informed Judge Rice of Plaintiff's acceptance.  (Tr. Oct. 17, 2008 at 76.)

   Judge Rice then brought the Parties and their counsel into his office, advised them that a

settlement had been reached.  Rather than ask the Parties to sign the Memorandum of

Understanding prepared at the July 3rd settlement conference, he reviewed aloud each term of the

settlement.  (Doc. No. 59 at 4; Tr. Oct. 17, 2008 at 23, 78.)  Judge Rice asked Plaintiff if she

understood and accepted the $265,000 settlement amount and each of the other terms set forth in

the Memorandum of Understanding.  (Doc. No. 59 at 4; Tr. Oct. 17, 2008 at 22-24, 30, 77-78.)

After Judge Rice read aloud each term, Plaintiff responded that she understood and agreed.

(Doc. No. 59 at 4; Tr. Oct. 17, 2008 at 22-24, 77-78.)  At the conclusion of the conference,

counsel agreed that Ms. Lashay would prepare the first draft of a final written settlement

agreement and provide it to Mr. Abramson for review.  (Doc. No. 59 at 5; Tr. Oct. 17, 2008 at

24-25, 80.)  The participants then thanked each other, shook hands, and left Judge Rice's

chambers.  (Doc. No. 59 at 5; Tr. Oct. 17, 2008 at 24, 80.)  Mr. Abramson testified that Plaintiff

"seemed pleased" with the settlement, and that he took her to lunch, during which Plaintiff

seemed "relie[ved]."  (Tr. Oct. 17, 2008 at 80, 116.)

   Plaintiff testified before me that she did not recall Judge Rice's review of each settlement

term or her statements that she understood and accepted each term.  (Tr. Oct. 17, 2008 at 139.)

Rather, she testified that *after* the August 13th conference, she "realized" she had been suffering

from "problems with regards to [her] mental and physical health" during the conference.  (Tr.

Oct. 17, 2008 at 131-32.)  She testified that she sought to leave the conference, but Mr.

Abramson would not allow her to do so.  (Tr. Oct. 17, 2008 at 131.)

9

Plaintiff elaborated on her version of events in a written narrative that I agreed to consider over Defendant's hearsay objection.  In this narrative, dated September 22, 2008, Plaintiff states:

> It was following the settlement conference th[at] I learned that Andrew Abramson inappropriately rejected [my] request [to end the conference] and settled the case. Andrew Abramson refused to address [my health problems] in order to support his own interests in the case.  Andrew Abramson proceeded to intimidate and threaten me to go along with his wishes.

(Pl.'s Ex. 4 at 1.)

Plaintiff's version of events is wholly incredible.  Mr. Abramson is an experienced, extremely competent attorney whose testimony is entirely credible, and is fully corroborated by the testimony of Ms. Lashay, the contemporaneous emails between Plaintiff and Mr. Abramson, Mr. Abramson's contemporaneous notes, and the events recited in Judge Rice's Report and Recommendation.  Throughout the negotiations, Mr. Abramson acted in Plaintiff's best interest. His advice to her reflected his experience, his best professional judgment, and his evaluation of the strengths and weaknesses of Plaintiff's case.  Although Plaintiff solicited Mr. Abramson's advice, the decision to settle on August 13th was hers.

Plaintiff's Refusal to Sign the Final Written Settlement Agreement

Mr. Abramson testified that the day after the August 13th conference, Plaintiff called him to ask whether she had "do[ne] the right thing" by agreeing to the settlement.  (Tr. Oct. 17, 2008 at 81.)  Mr. Abramson reiterated to Plaintiff that a binding agreement had been reached, and that the settlement was a "fabulous" result for her.  (Tr. Oct. 17, 2008 at 118.)

In her August 15, 2007 email to Mr. Abramson, Plaintiff referred to a "problem with [the] draft memorandum of understanding" that she wished to discuss with Mr. Abramson, and

asserted that she only "agree[s] to the dollar amount shown in number 2 on the memorandum of understanding [($265,000)]." (ASA0041.) Mr. Abramson responded that he was unaware of any "problem" with the Memorandum of Understanding, and reminded Plaintiff that she had "communicated [her] consent to each term on [August 13, 2007], first to [Mr. Abramson] privately, and then in front of Judge Rice and Defendant's representatives." (ASA0041.) Following this email correspondence, Mr. Abramson was unable to reach Plaintiff for several days. (Tr. Oct. 17, 2008 at 83.)

Plaintiff's boyfriend also contacted Mr. Abramson with concerns about the settlement. (ASA0080; Tr. Oct. 17, 2008 at 84.) In a September 5, 2007 email to Mr. Abramson, Plaintiff's boyfriend stated that he had "no doubt that within [the Settlement Agreement] are unfair and unnecessary terms and conditions that will need to be either deleted or modified," and expressed his belief that the Parties had "reached an impasse, which [he did] not see a resolution to at this time." (ASA0080.) Mr. Abramson replied that he could not discuss the matter with him without Plaintiff's permission. (ASA0080.)

On September 7, 2007, Mr. Abramson met with Plaintiff and her boyfriend for almost five hours to review the final Settlement Agreement prepared by Ms. Lashay and Mr. Abramson. (Tr. Oct. 17, 2008 at 84.) During this meeting, Plaintiff expressed a "hesitancy" to sign the Agreement that Mr. Abramson "could not understand." (Tr. Oct. 17, 2008 at 83.) Mr. Abramson explained to Plaintiff that the final Agreement was "a legal document that says nothing more, nothing less, than what [Plaintiff] had agreed to with Judge Rice," and exhaustively reviewed each term of the Agreement with Plaintiff. (Tr. Oct. 17, 2008 at 85.) After five hours of discussion, Plaintiff told Mr. Abramson that she wanted to speak briefly with her boyfriend, and

11

left Mr. Abramson's office.  (Tr. Oct. 17, 2008 at 86.)  Without explanation, Plaintiff never

returned.  (Tr. Oct. 17, 2008 at 86.)  Mr. Abramson then informed Ms. Lashay that Plaintiff had

refused to sign the Settlement Agreement.  (Tr. Oct. 17, 2008 at 86.)

Plaintiff has repeatedly sought to avoid complying with Orders issued by me and Judge

Rice by claiming various maladies.  Other than her own incredible testimony, she has provided

absolutely no admissible evidence to me or Judge Rice that she suffers from any illness.  In her

Objections to Judge Rice's Report and Recommendation, she nonetheless claims that she was ill

during the August 13th settlement conference.  Both Mr. Abramson and Ms. Lashay testified

credibly, however, that at no point during that conference did Plaintiff appear to be ill, in pain, or

confused about what was happening.  (Tr. Oct. 17, 2008 at 23-24, 79-80.)  Although Plaintiff

suggests in her Objections that she was also suffering from stress due to car trouble in the days

before the conference (Doc. No. 115 at 3), Plaintiff did not mention any such stress when she

testified before me.  In any event, like Judge Rice, I find that any such stress was alleviated when

Mr. Abramson agreed to drive Plaintiff to the settlement conference.  (Doc. No. 59 at 5; Tr. Oct.

17, 2008 at 110-11.)

In sum, I simply do not believe Plaintiff's testimony that she was suffering from stress,

mental problems, or physical problems that diminished her capacity to participate intelligently in

the August 13th settlement conference.  Nor do I believe that Mr. Abramson pressured Plaintiff

into agreeing to the settlement.  Rather, I find that Plaintiff knowingly, voluntarily, and

intelligently agreed to settle this matter for a payment of $265,000 and the other terms and

conditions set out in the Parties' Memorandum of Understanding.  She subsequently decided that

she wanted more favorable terms from Defendant, refused to sign the Parties' formal Settlement

Agreement, and has repeatedly sought to obstruct and delay what she now believes is an

undesirable resolution of this matter.


## CONCLUSIONS OF LAW

I.      Standard of Review

        The extent of my review of the Magistrate's Report is committed entirely to my

discretion.  See Jozefick v. Shalala, 854 F. Supp. 342, 347 (M.D. Pa. 1994); see also Thomas v.

Arn, 474 U.S. 140, 154 (1985); Goney v. Clark, 749 F.2d 5, 7 (3d Cir. 1984); Heiser v. Ryan,

813 F. Supp. 388, 391 (W.D. Pa. 1993), aff'd, 15 F.3d 299 (3d Cir. 1994).  I may "accept, reject

or modify, in whole or in part, the [M]agistrate's findings or recommendations."  Brophy v.

Halter, 153 F. Supp. 2d 667, 669 (E.D. Pa. 2001).  I must review de novo, however, those

portions of the Report to which specific objection is made.  28 U.S.C. § 636 (b)(1)(C); see

generally Goney, 749 F.2d at 6-7.  Once again, I have conducted a de novo review of Judge

Rice's entire Report and Recommendation.


II.     Plaintiff's Objections to the Report and Recommendation

        A.      Lack of Capacity

        Plaintiff argues that she did not have the mental capacity to enter into a settlement

agreement on August 13, 2007.  (Doc. No. 115 at 6.)  As I have found, however, Plaintiff was

fully competent to enter into the settlement on August 13th.  I have rejected Plaintiff's

uncorroborated, self-serving testimony and written narrative and credited the testimony of Mr.

Abramson and Ms. Lashay.  See, e.g., Estate of McGovern v. State Employees' Ret. Bd., 517

13

A.2d 523, 526 (Pa. 1986) ("[A] person's mental capacity [to execute a contract] is best determined by his spoken words and his conduct, and . . . the testimony of persons who observed such conduct on the date in question outranks testimony as to observations made prior to and subsequent to that date.") (emphasis omitted).  Accordingly, I overrule Plaintiff's Objection to Judge Rice's finding that Plaintiff knowingly agreed to settle her case during the August 13th conference.

      B.    Formal Acceptance

Plaintiff also argues that as a matter of law, there was no formal acceptance of Defendant's settlement offer during the August 13th conference.  I reject each of Plaintiff's arguments, and overrule this Objection to Judge Rice's Report and Recommendation.

      (1)    Plaintiff Did Not Sign the Memorandum of Understanding

Plaintiff argues that there was no formal acceptance because she did not sign the Memorandum of Understanding the Parties used during the August 13th settlement conference.  I disagree.  The Third Circuit has held that an "agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing."  Green v. John H. Lewis & Co., 436 F.2d 389, 390 (3d Cir. 1970). Plaintiff verbally agreed to all the terms of the Memorandum of Understanding.  She was not asked to sign and never refused to sign the Memorandum of Understanding during the July 3rd or the August 13th conferences.  Thus, the absence of her signature on the Memorandum of Understanding does not impugn her decision to settle.  See Forte Sports, Inc. v. Toy Airplane

14

Gliders of Am., Inc., 371 F. Supp. 2d 648, 650 (E.D. Pa. 2004) ("While a signed settlement

agreement or release is certainly customary when resolving legal disputes, the failure to execute

such a document . . . does not negate the existence of a legally binding settlement.").

Plaintiff also suggests that it "could easily be argued" that an unsigned settlement

document in a sex discrimination lawsuit should not be enforced as a matter of public policy.

(Doc. No. 135 at 8.)  In support, Plaintiff cites section 179 of the Restatement (Second) of

Contracts ("Bases of Public Policies Against Enforcement"), which provides that a "public policy

against the enforcement of promises or other terms may be derived . . . from legislation relevant

to such policy," or from "the need to protect some aspect of the public welfare."  Section 179 has

nothing to do with the viability of the Parties' unsigned Memorandum of Understanding, and

Plaintiff has pointed to no legislation or "aspect of the public welfare" that supports a policy of

refusing to enforce the settlement in this case.  Accordingly, I overrule this Objection.


### (2)    No Manifestation of Assent

Plaintiff argues that she did not actually agree to the settlement on August 13, 2007

because "[t]here was no memorable remark or some excited gesture of relief emanating from

[Plaintiff] that showed her litigation was now over for the purported settlement amount of

$265,000."  (Doc. No. 135 at 6.)  I disagree.  I have found that Plaintiff more than sufficiently

manifested her assent by verbally confirming both to her lawyer and to Judge Rice that she

understood and accepted each term of the settlement.  Accordingly, I overrule this Objection.

(3)    Differences Between the Memorandum of Understanding and the Settlement Agreement

Finally, Plaintiff argues that there was no enforceable agreement to settle because the Memorandum of Understanding and the final written Settlement Agreement "are very different in title, appearance, length and content."  (Doc. No. 115 at 4.)  Plaintiff notes that unlike the Memorandum of Understanding, the Settlement Agreement: (1) is eight pages long; (2) has a different title; (3) includes signature lines for the Parties; and (4) includes numerous "recitals" and "items" not included in the draft Memorandum of Understanding.  (Doc. No. 115 at 4.)

The differences in the title, length, and form of these two documents -- as well as the inclusion of standard, additional terms in the final Settlement Agreement -- do not impugn Plaintiff's acceptance of the settlement's essential terms during the August 13th conference.  See Compu Forms Control, Inc. v. Altus Group, Inc., 574 A.2d 618, 622 (Pa. Super. 1990) ("[I]f [the] parties agree on essential terms and intend them to be mutually binding, a contract is formed even though the parties intend to adopt a formal document later which will include additional terms.").  Moreover, the only terms in the Settlement Agreement specifically cited by Plaintiff as examples of differences between the two documents -- the provisions prohibiting Plaintiff from seeking future employment with Defendant, releasing all claims against Defendant, and penalizing Plaintiff if she breaches confidentiality (Doc. No. 115 at 4) -- are in fact included in the Memorandum of Understanding.  (Doc. No. 115, Ex. A.)

As I have found, Plaintiff has refused to execute the Settlement Agreement because she wants more favorable terms from Defendant. Plaintiff's change of heart immediately after August 13, 2007 -- before she was presented with the formal Settlement Agreement -- does not negate

16

her acceptance of the settlement.  See McCune v. First Judicial Dist. of Penn. Prob. Dep't, 99 F.

Supp. 2d 565, 566 (E.D. Pa. 2000) (a settlement agreement is "still binding, even if it is clear that

a party had a change of heart between the time he agreed to the terms of the settlement and when

those terms [are] reduced to writing.").  Accordingly, I overrule this Objection.


### CONCLUSION

Upon *de novo* consideration of Judge Rice's thoughtful Report and Recommendation,

Plaintiff's Objections, and all related submissions, and after conducting an evidentiary hearing on

Plaintiff's Objections, I overrule Plaintiff's Objections and accept and adopt the Report and

Recommendation.


Accordingly, this 27th day of January, 2009, it is **ORDERED** that Defendant's Motion to

Enforce Settlement (Doc. No. 40) is **GRANTED as follows**:

1.      Upon receipt of this Order, Defendant shall execute the Parties' final, written

        Settlement Agreement and provide it to Plaintiff's counsel, Mark J. Vasoli,

        Esquire.  Mr. Vasoli shall promptly execute that Agreement on behalf of Plaintiff.

        See Pergosky v. Penn. Power & Light Co., No. 03-6549, 2004 WL 765108, at * 1

        (E.D. Pa. Mar. 2, 2004) (Van Antwerpen, J.) (directing the Clerk of Court to

        execute Settlement Agreement on behalf of the plaintiff).  Once Mr. Vasoli

        executes the Agreement as described above, the Agreement shall have the same

        force and effect as though Plaintiff herself had executed it.

2.      Upon receipt of the Settlement Agreement executed by Mr. Vasoli on Plaintiff's

17

behalf, Defendant shall, pursuant to paragraphs 2 and 3 of the Settlement

Agreement, promptly pay the sum of $265,000 as follows: (1) Defendant shall pay

$109,626.04 to the Law Office of Andrew S. Abramson (Pl.'s Ex. 2 ¶ 2(a)); and

(2) Defendant shall pay the remaining amount to Plaintiff and Mr. Vasoli, which

shall be disbursed for tax purposes in accordance with the Parties' Agreement

(Pl.'s Ex. 2 ¶¶ 2(b)-(c), 3.)

3.      This case is dismissed with prejudice pursuant to Local Rule 41.1(b).

4.      The Clerk of Court shall close this case for statistical purposes.


                                        AND IT IS SO ORDERED.

                                        *s/ Paul S. Diamond*

                                        _____

                                        **Paul S. Diamond, J.**


18